UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GCT NEW YORK LP,

                          Plaintiffs,                    Case No. 20-cv-_____

              -against-

MAERSK LINE A/S and
HAMBURG SUDAMERIKANISCHE
DAMPFSCHIFFFAHRTS GESELLSCHAFT
APS & CO. KG

                          Defendants.

## COMPLAINT

1.     Plaintiff GCT New York LP, formerly New York Container Terminal, LLC

("GCT"), by its undersigned attorneys, complaining of the defendants Maersk Line A/S

("Maersk") and Hamburg Sudamerikanische Dámpfschifffahrts-Gesellschaft APS & Co. KG

("Hamburg Sud" and, collectively with Maersk, "Defendants") herein, alleges as follows:

### NATURE OF THE ACTION

2.     GCT operates a marine container terminal (the "Terminal") on Staten Island, New

York, in the Port of New York (the "Port").  Defendants are major shipping lines whose vessels

operate in three weekly liner services that come to the Port and call at the Terminal pursuant to a

long term agreement which may not be terminated for convenience prior to December 31, 2021,

and only then upon a minimum of six months prior written notice.

3.      GCT provides stevedore and marine terminal services to vessels owned, chartered

or operated by Defendants and it has the exclusive right to furnish such services in the Port through

at least December 31, 2021.  GCT commences this action to obtain injunctive relief preventing

Defendants  from (a) terminating the agreement on May 1, 2020—a full 20 months before the

1

earliest date allowed for termination without cause; (b) terminating the agreement on twenty days' notice in violation of the six month notice requirement contained in the agreement; and (c) transferring all business from the Terminal to a competing marine container terminal in the Port that is operated by a corporate affiliate of Maersk, in violation of the exclusivity provisions contained in the agreement.

4.      The services provided to Defendants' pursuant to that agreement (and another shipping line that jointly operates two of the liner services with Hamburg Sud) form a material part of GCT's container handling business at the Terminal (accounting for 60% of its ocean carrier container handling business in 2019), and the premature loss of that business will irreparably and seriously threaten the financial viability of the Terminal and immediately reverse its commercial prospects, particularly since the prospect of securing alternative business in the current commercial and economic environment in the Port makes that prospect remote.

5.      Maersk purports to terminate its long term, multimillion dollar agreement through the device of a one page letter delivered to GCT as a *fait accompli* in the afternoon on April 10, 2020, a public holiday in the Port, in the midst of the COVID-19 emergency gripping the New York metropolitan area.

6.      Maersk's plan to enrich its own terminal at the expense of GCT will cause GCT's revenues at the Terminal to plummet by more than half, with resulting negative annual earnings before interest, tax, depreciation and amortization ("EBITDA").  Without positive EBITDA, the Terminal will cease to be a going concern.  Permitting Defendants to walk away from their contractual obligations in the current environment would thus significantly jeopardize the Terminal's continued viability.

## JURISDICTION AND VENUE

7.      This Court possesses subject matter jurisdiction because this is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, and is an admiralty and maritime claim within the meaning of Fed. R. of Civ. P. 9(h), in that it involves claims for breach of a maritime contract for stevedoring and terminal services.

8.      This Court possesses personal jurisdiction over Defendants:

(a)      because (i) they have purposefully directed their activities at the Southern District of New York (as defined at 28 U.S.C. § 112(b) to include the waters within the Eastern District of New York), and (ii) the litigation arises out of or relates to those activities; and

(b)      pursuant to New York General Obligations Law § 5-1402, because the action arises out of an agreement for which a choice of New York law has been made, and which (i) relates to obligations arising out of a transaction covering in the aggregate not less than one million dollars, and (ii) contains a provision whereby such parties agreed to submit to the jurisdiction of this Court.

9.      Venue is proper in this District pursuant to:

(a)      28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred within this District;

(b)      28 U.S.C. § 1391(b)(1), because Defendants reside in this District as such term is defined at 28 U.S.C. § 1391(c)(2); and

(c)      the foregoing express forum selection clause.

## THE PARTIES

10.      Plaintiff GCT is a limited partnership organized under the laws of the State of Delaware with an office and principal place of business at 300 Western Avenue, Staten Island, New York.

11.     GCT is engaged in the business of stevedoring and marine terminal operations, including the loading, discharging and berthing of vessels carrying cargoes in the navigable waters of the United States.

12.     Upon information and belief, defendant Maersk is an "aktieselskabet" or corporation, organized under the laws of the Kingdom of Denmark, with a principal place of business in Denmark.

13.     Maersk is an ocean common carrier within the meaning of 46 U.S.C. § 40102(18) that owns and owns and operates vessels transporting containerized cargoes to and from ports throughout the United States, including the Port.

14.     Upon information and belief, defendant Hamburg Sud is a "kommanditgesellschaft" or limited partnership organized under the laws of the Federal Republic of Germany, with a principal place of business in Germany.

15.     Hamburg Sud is an ocean common carrier within the meaning of 46 U.S.C. § 40102(18) that owns and owns and operates vessels transporting containerized cargoes to and from ports throughout the United States, including the Port.

16.     Upon information and belief, Hamburg Sud was acquired by Maersk on November 30, 2017, and became a part of the A.P. Moller Group of companies.

**BACKGROUND**

17.     GCT operates the Terminal pursuant to a marine terminal lease (the "Lease," annexed as Exhibit A hereto) with The Port Authority of New York and New Jersey ("PANYNJ"). The Terminal is one of six marine container terminals in the Port.

18.     As is common practice in the marine terminal industry in the Port and throughout the United States, marine terminal operators rely upon long-term service commitments from their

ocean carrier customers as such commitments are critical for logistics preparation, budgeting, capital planning and investment purposes.

**The Maersk-Hamburg Sud-Hapag Lloyd Service Strings**

19.     Maersk and Hamburg Sud own, charter and operate oceangoing vessels that transport containerized cargoes to and from ports throughout the world.

20.     As with many other liner operators, many of their vessels operate on dedicated routes and regular schedules which are known in the industry as "service strings" or "strings."

21.     Some strings that call at U.S. ports are operated independently while others are operated jointly with other ocean carriers pursuant to vessel sharing agreements or other cooperative working agreements.

22.     Maersk and Hamburg Sud currently operate three weekly service strings that come to the Port and call at the Terminal:

(a)     The North Atlantic Service (the "NAE Service"), is operated independently by Maersk.  GCT typically receives and handles approximately 207 twenty-foot equivalent units ("TEUs")[1] at the Terminal per week in connection with the NAE Service.

(b)     The East Coast South America – East Coast U.S. Service (the "ECSA Service"), is operated jointly by Hamburg Sud and nonparty Hapag Lloyd AG ("Hapag Lloyd"), both of whom contribute vessels to it.  GCT typically receives and handles approximately 2,000 TEUs at the Terminal per week in connection with the ECSA Service.

(c)     The West Coast South America – East Coast U.S. Service (the "WCSA Service"), is also operated jointly by Hamburg Sud and Hapag Lloyd.  GCT typically receives and

---

[1] A TEU is an acronym for twenty-foot equivalent unit which is standard measurement unit used in connection with intermodal shipping containers.  Accordingly, one twenty-foot container equals one TEU while one forty-foot container equals two TEUs.

handles approximately 1,926 TEUs at the Terminal per week in connection with the WCSA Service.

23.     The NAE Service, ECSA Service and WCSA Service (collectively, the "Strings") together account for approximately sixty percent of the ocean carrier container shipping business at the Terminal (GCT also provides stevedoring and marine terminal services to a waste energy company in connection with that company's intra-harbor barge operation of containerized municipal waste which is transferred through the Terminal; Even if these barge operations are included in the calculation, the Strings still account for forty-six percent of the container handling business at the Terminal).

24.     In 2019, the Strings collectively delivered 153 vessel calls at the Terminal and accounted for approximately $52.6 million in revenues.

### GCT's Agreement with Maersk and Hamburg Sud

25.     The principal focus of this action is a stevedoring and marine terminal services agreement between GCT and Maersk-Hamburg Sud, by which Maersk and Hamburg Sud appointed GCT, throughout the term of the agreement, as their exclusive provider of such services for the Strings in the Port.

26.     Maersk and GCT entered into an Agreement for Terminal Services dated June 22, 2015 (the "Original Agreement, " annexed as Exhibit B hereto).

27.     Under the terms of the Original Agreement, Maersk engaged GCT to provide stevedoring and marine terminals services (the "Services") for and on behalf of Maersk and its owned and operated vessels (including those operating under the Sealand trade name) carrying containerized cargoes to and from the Terminal.

28.     The parties subsequently amended the Original Agreement twice.

29.     First, Maersk and GCT amended the Original Agreement through a First Amendment to Agreement for Terminal Services dated June 23, 2017 (the "First Amendment," annexed as Exhibit C hereto).

30.     Next, the Original Agreement was amended by a Second Amendment to Agreement for Terminal Services dated as of November 19, 2018 (the "Second Amendment," annexed as Exhibit D hereto; together with the Original Agreement and the First Amendment, the "Agreement"), which Maersk, Hamburg Sud and GCT entered into following Maersk's acquisition of Hamburg Sud in November 2017.

31.     The Second Amendment added Hamburg Sud as a party to the Original Agreement and First Amendment and terminated then-existing stevedoring and marine terminal service agreements and arrangements between GCT and Hamburg Sud.

32.     The Second Amendment changed the structure of the Agreement by extending its term from June 22, 2019, to December 31, 2022, subject only to Maersk's option to terminate the Agreement for convenience on December 31, 2021 (the "Term") (*see* Second Amendment §§ 2 and 11).

33.     In order to exercise this early termination option, the Second Amendment obligates Defendants to provide not less than six months' written notice on or before June 30, 2021 (*see* Second Amendment § 11).

34.     The notice period was negotiated and included to provide GCT sufficient lead time to adequately adjust to and prepare for any loss of business at the end of 2021, bearing in mind that much of the alternative container handling business in the Port is locked into fixed term contracts.

35.     The Second Amendment compels Maersk and Hamburg Sud to bring all vessel calls in the Port for the three Strings to the Terminal throughout the Term (the only exception being a *force majeure* event temporarily incapacitating the Terminal) (*see* Second Amendment § 5).

36.     In addition, the Second Amendment prohibits Maersk and Hamburg Sud from using any other container terminal in the Port to provide Services to the Strings (*see* Second Amendment § 5).

37.     GCT thus enjoys the exclusive right throughout the Term to provide Services to all Maersk and Hamburg Sud vessels operating in the Strings and calling in the Port.

38.     The fixed term and exclusivity aspects of the Second Amendment were negotiated and agreed between the parties as an essential and integral part of the Agreement.

39.     If not for these promises and commitments from Maersk and Hamburg Sud, GCT would not have reciprocally agreed to the volume discount program and favorable contract rates set forth in the Second Amendment.

40.     Hapag Lloyd – the carrier that contributes to two of the Strings at issue – does not currently have a long-term marine terminal services agreement with GCT. However, because of the vessel sharing arrangements between Hapag Lloyd and Hamburg Sud with respect to the ECSA and WCSA Services, its vessels also call at the Terminal and GCT provides stevedoring and marine terminal services to Hapag Lloyd as a result.

### Repudiation of Agreement by Maersk and Hamburg Sud

41.     In March 2020, GCT learned that Maersk and Hamburg Sud might breach the Agreement by terminating it prematurely and transferring all Services and business associated with the Strings from GCT to APM Terminals Elizabeth ("APMT").

42.     APMT is a competing marine container terminal in the Port and a corporate affiliate of Maersk (The Maersk 2019 Annual Report (publicly available at

8

https://investor.maersk.com/investor-relations) confirms that each of Maersk, Hamburg Sud and
APMT is a 100% wholly-owned subsidiary of A.P. Moller – Maersk A/S).

43.     GCT wrote to Maersk on March 2, 2020, expressing serious concerns about a
material breach of the Agreement and requesting that Maersk confirm its intentions with respect
to its ongoing performance obligations (letter annexed as Exhibit E hereto).  Maersk did not reply.

44.     Further concerned that APMT was attempting to induce Maersk and Hamburg Sud
to prematurely exit the Agreement, in order to bolster its own container throughput volumes, GCT
wrote to APMT on March 13, 2020 notifying APMT that Maersk was contractually bound to GCT
and the Terminal through at least December 31, 2021, and cautioning APMT not to take any action
which might induce or cause Maersk to cancel the Agreement prematurely (letter annexed as
Exhibit F hereto).  APMT also did not reply.

45.     In the third week of March, without any advance notification from Maersk, GCT
learned that Maersk had rerouted two vessels that should have called at the Terminal in connection
with the Strings to a competing terminal in the Port.

46.     Those two vessels, the CAP ANDREAS and the MAERSK KARACHI, had on
board a combined 957 import and export containers that should have been handled by GCT under
the Agreement.

47.     The loss of these specific container volumes at the Terminal resulted in the loss of
stevedoring and terminal handling revenues totaling no less than $228,359.00.

48.     On April 10, 2020, the Good Friday public holiday recognized by all container
terminal operators in the Port, and in the midst of the ongoing COVID-19 emergency in the New
York metropolitan area, GCT received a letter from Maersk purporting to terminate the Agreement

without cause on a mere 20 days' notice, rather than the required 6 months' notice (the "Repudiation Letter," annexed as Exhibit G hereto).

49.     In blatant violation of the fixed term provisions contained in the Agreement, Maersk announced in the Repudiation Letter that "all Maersk Line-operated vessels (including those Sealand and Hamburg Sud services currently calling at GCT)" would cease calling at GCT "no later than May 1, 2020."

50.     The effective date of the purported termination was thus a full 20 months before the earliest date by which the Agreement could be terminated by Maersk for convenience, *i.e.*, December 31, 2021.

51.     In blatant violation of the exclusivity provisions contained in the Agreement, Maersk advised GCT that all three Strings and associated vessels and Services would be transferred from GCT to its affiliate APMT, on the New Jersey side of the Port, on or before May 1, 2020.

52.     Maersk and Hamburg Sud are not purporting to terminate the Agreement for cause; they are attempting to do so for their own convenience and for the financial benefit of their affiliate APMT, which directly competes with GCT for business in the Port.

53.     The Agreement contains a bargained for procedure governing termination for convenience (*see* Second Amendment § 11), and Maersk and Hamburg Sud are blatantly violating it.

54.     Maersk and Hamburg Sud are not cancelling the Strings or leaving the Port altogether.  Rather, they are effecting a wholesale transfer of the business associated with the Strings from GCT to APMT, in total derogation of the exclusivity protections granted to GCT for the next 20 months.

**Irreparable Injury to GCT**

55.     The wrongful and premature effort by Maersk and Hamburg Sud to terminate the Agreement, and the precipitous manner in which they seek to do so, will have immediate and catastrophic effects on the business and financial well-being of GCT and its employees, which are exacerbated given the timing of the purported termination.

56.     The purported termination will not only involve the exit of Maersk and Hamburg Sud, but the exit of Hapag Lloyd as well.

57.     As detailed above, GCT does not currently have a long-term contract with Hapag Lloyd, but provides Services to it as a result of vessel sharing arrangements between Hapag Lloyd and Hamburg Sud.  If Hamburg Sud departs, then Hapag Lloyd will necessarily also do so.

58.     The three Strings account for approximately sixty percent of the containerized volumes at the Terminal (excluding, as noted above, services that GCT provides to a waste energy company), generating on average 3 vessel calls and containerized throughput of approximately 4,133 TEUs per week.

59.     In 2019, the Strings collectively delivered 153 vessel calls at the Terminal and accounted for approximately $52.6 million in total revenues.

60.     Projected over the course of the next 20 months, this translates to a catastrophic loss of at least 240 vessel calls and 330,640 TEUs.

61.     Almost all of the existing container shipping business at competing container terminals in the Port is currently locked into long-term terminal service agreements (similar to GCT's agreement with Defendants, upon which it relied).

62.     And the current public health crisis precludes GCT from pursuing on short notice what little available business may exist (which would, in no event, be sufficient to replace the loss of the three Strings).

63.     According to 2020 budget projections, GCT expected to generate annual revenues of approximately $124.7 million with annual EBITDA of approximately $30.3 million for 2020.

64.     If Maersk and Hamburg Sud are permitted to walk from the Terminal in blatant disregard of their obligations and contractual commitments, revenues are projected to plummet by more than half to $61.9 million or less, with resulting annual EBITDA of negative $7.1 million.

65.     Without positive EBITDA, the Terminal will cease to be a going concern. Permitting Defendants to walk away from their contractual obligations in the current environment would thus significantly jeopardize the Terminal's continued viability.

66.     A threat to GCT's continued viability is a threat to the local economy of Staten Island.  GCT is one of the top private employers on Staten Island, providing secure and good paying jobs to many longshoremen, many of whom have depended upon the Terminal for their livelihoods for many years.

67.     If Maersk and Hamburg Sud are permitted to exit the Terminal on a whim and in gross violation of their obligations and commitments under the Agreement, their action will cause an immediate loss of jobs.

68.     As measured in man hours and full-time equivalents, GCT projected a total of 721,599 man hours to be worked at the Terminal in 2020, which translates to approximately 345 full time equivalent positions.

69.     With the loss of business threatened by Maersk and Hamburg Sud, the number of man hours at the Terminal is projected to fall to 460,844 with full time equivalent positions declining to just 221.

70.     Even if the Terminal remains viable for a period, those longshoremen whose positions are not terminated will experience a drastic drop in earnings due to less work hours

attributable to substantially less throughput moving through the Terminal.  Ultimately, Maersk's purported termination puts *all* of the jobs at the Terminal at eventual risk as it jeopardizes the viability of GCT's business.

71.     GCT's maintenance labor at the Terminal is provided by International Longshoremen's Association ("ILA") Local 1814 and employed through GCT's wholly-owned subsidiary, Island Securing & Maintenance, Inc. ("Island").

72.     The management association representing employers of Local 1814 labor, such as Island, is Metropolitan Marine Maintenance Contractors Association, Inc. ("MMMCA").

73.     MMMCA and the ILA have established various pension and welfare funds to administer benefits on behalf of active and retired workers covered under collective bargaining agreements between MMMCA and the union locals.

74.     A precipitous decline in the maintenance labor force at the Terminal caused by the threatened exit of Maersk and Hamburg Sud is likely to trigger unfunded liability obligations on the part of Island under the Metro-ILA Pension Fund.

75.     Furthermore, GCT is the sole employer of unionized labor from ILA Local 920.  If Maersk and Hamburg Sud are allowed to wrongfully exit the Terminal, causing sharp reductions in positions and hours, the impacts will be felt immediately by members of this Local.

76.     In addition, the revenue loss associated with Defendants' threatened breach will reverberate through the Staten Island economy and have adverse tax revenue effects for the City and State of New York.

77.     The sharp declines in business threatened by the precipitous actions of the Defendants will also have a knock-on effect on GCT's vendors, suppliers and third party service providers who depend on GCT for business.

78.     Defendants cannot be permitted to harm GCT, its employees and their community in blatant violation of Defendants' contractual obligations.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

79.     GCT repeats and realleges the allegations set forth in paragraphs 1 through 82 of the Complaint as if fully set forth herein.

80.     The Agreement is a valid and binding contract between GCT and the Defendants.

81.     GCT has fully performed under the Agreement, and neither Defendant has ever suggested otherwise, including within their purported termination notice.

82.     Defendants repudiated the Agreement in writing on April 10, 2020, purporting to terminate the Agreement as of May 1, 2020, 20 months prior to the earliest date on which they were entitled to effect termination and on only 20 days' notice, rather than the 6 months' notice required by the Agreement.

83.     GCT has suffered and will continue to suffer damages as a result of the foregoing repudiation of the Agreement.

## SECOND CAUSE OF ACTION

### (Injunctive Relief Pursuant to Fed. R. Civ. P. 65)

84.     GCT repeats and realleges the allegations set forth in paragraphs 1 through 86 of the Complaint as if fully set forth herein.

85.     There can be no reasonable dispute as to the validity of the Agreement, Defendants' repudiation of the Agreement or the lack of basis for such repudiation.  Accordingly, GCT is assured of success on the merits.

86.    If Defendants are not enjoined from breaching the Agreement, GCT will suffer irreparable injury for which the remedies available at law, including monetary damages, are inadequate.

87.    Specifically, GCT's revenues will plummet by more than half, with resulting negative annual EBITDA.  Without positive EBITDA, the Terminal will cease to be a going concern and its continued viability will be jeopardized.

88.    The balance of hardships between GCT and the Defendants warrants an award of injunctive relief to GCT.  While GCT will suffer irreparable injury in the absence of such injunctive relief, Defendants will experience no legally cognizable hardship at all if compelled to adhere to the terms of the Agreement.

89.    Enjoining Defendants from breaching their contractual obligations and thereby visiting irreparable harm upon GCT is consistent with the public interest.

### DEMAND FOR RELIEF

WHEREFORE, GCT prays that the Court enter an Order:

(a)    Temporarily, preliminarily and permanently enjoining Maersk and Hamburg Sud from:

(i)    terminating the Agreement for convenience prior to December 31, 2021, or on less than six months' prior written notice;

(ii)    directing, ordering, allowing or causing any marine terminal in the Port other than the Terminal to receive, deliver, handle, load or unload containerized cargoes transported to the Port by Maersk or Hamburg Sud in connection with the Service Strings; and

15

(iii)    directing, ordering, allowing or causing any vessel owned, chartered or operated by Maersk or Hamburg Sud, whether directly or indirectly, and operating in any Service String, to call at any marine terminal in the Port other than the Terminal, except as otherwise permitted under the terms of the Agreement;

(b)    In the alternative, awarding GCT damages for all direct and indirect, proximate, consequential and incidental damages described above in an amount to be demonstrated;

(c)    Awarding GCT its costs, disbursements and attorneys' fees incurred in this action; and

(d)    Awarding GCT such other and further relief as the Court may deem just and proper.

Dated: New York, New York.          Respectfully submitted,
       April 20, 2020
                                    **VEDDER PRICE P.C.**


                                    By: s/ Daniel C. Green
                                       David M. Rownd
                                       Daniel C. Green
                                       Joshua A. Dunn
                                       1633 Broadway, 31st Floor
                                       New York, New York  10019
                                       Telephone:  (212) 407-7735
                                       Facsimile: (212) 407-7799
                                       E-Mail:  drownd@vedderprice.com
                                              dgreen@vedderprice.com
                                              jdunn@vedderprice.com

                                    *Attorneys for Plaintiff GCT New York LP*

16