UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GCT NEW YORK LP,

                    Plaintiffs,

          -against-

MAERSK LINE A/S and
HAMBURG SUDAMERIKANISCHE
DAMPFSCHIFFFAHRTS GESELLSCHAFT
APS & CO KG

                    Defendants.

Case No. 20-cv-_____

---

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

VEDDER PRICE P.C.
David M. Rownd
Daniel C. Green
Joshua A. Dunn
1633 Broadway, 31st Floor
New York, New York  10019
Telephone:     (212) 407-7700
E-Mail:        drownd@vedderprice.com
               dgreen@vedderprice.com
               jdunn@vedderprice.com

*Attorneys for Plaintiff GCT New York LP*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

RELEVANT FACTS ............................................................................................................... 2

    The Maersk-Hamburg Sud-Hapag Lloyd Service Strings .................................................. 3

    GCT's Agreement with Maersk and Hamburg Sud ........................................................... 4

    Repudiation of Agreement by Maersk and Hamburg Sud ................................................. 7

    Irreparable Injury to GCT ................................................................................................ 9

ARGUMENT ........................................................................................................................ 13

Point One      GCT Will Suffer Irreparable Harm In The Absence Of Immediate
                 Injunctive Relief ........................................................................................ 13

Point Two      GCT Is Likely to Succeed On the Merits Of Its Claim  for Breach of
                 Contract .................................................................................................... 15

Point Three   The Balance Of The Hardships Tips Decidedly In GCT's Favor ....................... 17

Point Four    The Public Interest "Would Not Be Disserved" By Issuance Of The
                 Injunction ................................................................................................. 18

CONCLUSION ..................................................................................................................... 19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*American S.S. Owners Mut. Protection & Indemnity Ass'n, Inc. v. Triumph Maritime, Ltd.*,
    No. 18-CV-2019, LEXIS 205582 (S.D.N.Y. Nov. 26, 2019)..................................16

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008)....................................................................................15

*Doran v. Salem Inn, Inc.*,
    422 U.S. 922 (1975)..............................................................................................13

*Ecolab Inc. v. Paolo*,
    753 F. Supp. 1100 (E.D.N.Y. 1991) ....................................................................17

*Frank Felix Assocs. Ltd. v. Austin Drugs, Inc.*,
    111 F.3d 284,289 (2d Cir. 1997)....................................................................16, 17

*John B. Hull v. Waterbury Petroleum Products, Inc.*,
    588 F.2d 24 (2d Cir. 1978)....................................................................................13

*Johnson v. Nextel Commc'ns, Inc.*,
    660 F.3d 131 (2d Cir. 2011)..................................................................................16

*In re M/V MSC Flaminia*,
    339 F. Supp. 3d 185 (S.D.N.Y. 2018)..................................................................16

*Malarkey v. Texaco, Inc.*,
    794 F. Supp. 1248 (S.D.N.Y. 1992)......................................................................13

*Marks Org., Inc. v. Joles*,
    784 F. Supp. 2d 322 (S.D.N.Y. 2011)..................................................................13

*Petereit v. S.B. Thomas, Inc.*,
    63 F.3d 1169 (2d Cir. 1995), *cert. denied*, 517 U.S. 1119 (1996).........................14

*Progressive Restaurant Systems, Inc. v. Wendy's Int'l, Inc.*,
    90-CV-791, 1990 U.S. Dist. LEXIS 9289 (N.D.N.Y. July 20, 1990) ....................14

*S. Coal Corp. v. IEG PTY, LTD*,
    No. 14-CV-617, 2015 LEXIS 42942 (E.D. Va. Mar. 31, 2015).............................16

*Safeco Ins. Co. of Am. v. M.E.S., Inc*.,
    No. 09-CV-3312, 2010 LEXIS 133957 (E.D.N.Y. Dec. 17, 2010)........................13

*Salinger v. Colting*,
607 F.3d 68 (2d Cir. 2010)......................................................................................13

*Semmes Motor, Inc. v. Ford Motor Co.*,
429 F.2d 1197 (2d Cir. 1970)................................................................................13

*Septembertide Pub., B. v. Stein and Day, Inc.*,
884 F.2d 675 (2d Cir. 1989)..................................................................................16

*Sunward Elecs., Inc. v. McDonald*,
362 F.3d 17 (2d Cir. 2004)....................................................................................16

*Tradescape.com v. Shivaram*,
77 F. Supp. 2d 408 (S.D.N.Y. 1999)....................................................................17

## Rules

FED. R. CIV. P. 65 ..............................................................................................................1

Plaintiff GCT New York LP ("GCT" or "Plaintiff"), by its attorneys Vedder Price P.C., respectfully submits this memorandum of law in support of its motion for a temporary restraining order and preliminary injunction, pursuant to Fed. R. Civ. P. 65, enjoining Defendants Maersk A/S ("Maersk") and Hamburg Sudamerikanische Dámpfschifffahrts-Gesellschaft APS & Co. KG ("Hamburg Sud" and, collectively with Maersk, "Defendants") from wrongfully and prematurely terminating their fixed term maritime contract with GCT for the provision of stevedoring and terminal services.

## PRELIMINARY STATEMENT

Maersk is one of the world's largest shipping lines and Hamburg Sud is among its subsidiaries. GCT is a stevedore and marine terminal operator which leases and operates a container terminal on Staten Island. GCT is among Staten Island's largest private employers.

GCT and Defendants are parties to a long term stevedoring and marine terminal services agreement pursuant to which Defendants engaged GCT to provide services for and on behalf of their vessels at the terminal on an exclusive basis in the Port of New York (the "Port") through December 31, 2022, subject only to Defendants' right to terminate the agreement for convenience on December 31, 2021, upon the giving of not less than six months' prior written notice.

Because Hamburg Sud jointly operates two of its liner services that call at the terminal with a third ocean carrier, GCT provides stevedoring and marine terminal services to that carrier as well. The services provided by GCT to Defendants and the third carrier form a material portion of GCT's business overall container handling business. In 2019, for example, those services accounted for sixty percent of GCT's ocean carrier container-handling business at the terminal.

On April 10, 2020, in the afternoon of the Good Friday holiday in the Port and in the middle of the COVID-19 emergency gripping the New York metropolitan area, GCT received a letter

from Maersk. In it, Maersk advised GCT that it was purporting to terminate the agreement on a mere 20 days' notice on May 1, 2020—a full 20 months before the earliest date that Maersk could legitimately terminate the agreement for convenience. Maersk did not assert that GCT was itself in breach nor did it provide any reason or justification for its action. The decision was presented as a *fait accompli* notwithstanding the clear terms of the agreement.

To make matters worse, GCT learned that Maersk was planning to transfer the entire business (and the third party business) to a container terminal in the Port that is operated by a Maersk corporate affiliate known as APM Terminals ("APMT"). APMT and GCT are direct competitors in the Port; accordingly, any action taken by Maersk to transfer business from GCT to APMT would be in clear violation of the exclusivity protections afforded GCT in the agreement. Defendants do not dispute this fact nor can they.

The decision to repudiate the agreement in violation of its clear and unambiguous terms was no doubt induced by APMT in order to enrich itself at the expense of GCT. APMT will be hearing from GCT in due course. In the meantime, the actions planned by Defendants must be stopped by this Court because their execution will cause catastrophic and irreparable harm to GCT, as will be discussed below. Accordingly, GCT respectfully requests this Court to issue a temporary restraining order and—once Defendants have been heard—a preliminary injunction enjoining Defendants from acting upon their repudiation.

GCT easily satisfies all elements necessary for an award of injunctive relief.

### RELEVANT FACTS

GCT is the operator of a marine container terminal located on Staten Island, New York, (the "Terminal"), which it leases from The Port Authority of New York and New Jersey ("PANYNJ") pursuant to an Amended and Restated Agreement of Lease dated as of January 1,

2013, as further amended by Supplement No. 1 dated December 4, 2018 (the "Lease," annexed as Exhibit A to GCT's concurrently-filed Complaint) (*see* accompanying Declaration of John Atkins (the "Atkins Dec.") ¶ 2).[1]

There are six container terminals and five competing marine container operators in the Port, inclusive of GCT (Atkins Dec. ¶ 4). As is common practice in the marine terminal industry in the Port and throughout the United States, marine terminal operators rely upon long-term service commitments from their ocean carrier customers as such commitments are critical for logistics preparation, budgeting, capital planning and investment purposes (*Id.*).

### The Maersk-Hamburg Sud-Hapag Lloyd Service Strings

Maersk and Hamburg Sud own, charter and operate oceangoing vessels that transport containerized cargoes to and from ports throughout the world (Atkins Dec. ¶ 5). As with many other liner operators, many of their vessels operate on dedicated routes and regular schedules which are known in the industry as "service strings" or "strings" (*Id.*). Some strings that call at U.S. ports are operated independently while others are operated jointly with other ocean carriers pursuant to vessel sharing agreements or other cooperative working agreements (*Id.*).

Maersk and Hamburg Sud currently operate three weekly service strings that come to the Port and call at the Terminal:

- The North Atlantic Service (the "NAE Service"), which Maersk operates independently. GCT typically receives and handles on approximately 207 twenty-foot equivalent units ("TEUs")[2] at the Terminal per week in connection with the NAE Service (Atkins Dec. ¶ 7).

- The East Coast South America – East Coast U.S. Service (the "ECSA Service"), which is operated jointly by Hamburg Sud and nonparty Hapag Lloyd AG ("Hapag Lloyd"), both

---

[1] In the current COVID-19 emergency, the Terminal is deemed to be an essential business that is allowed to remain open in order to support transportation supply chains.

[2] A TEU is an acronym for twenty-foot equivalent unit which is standard measurement unit used in connection with intermodal shipping containers. Accordingly, one twenty-foot container equals one TEU while one forty-foot container equals two TEUs.

of whom contribute vessels to it.  GCT typically receives and handles approximately 2,000 TEUs at the Terminal per week in connection with the ECSA Service (*Id.* ¶ 8).

- The West Coast South America – East Coast U.S. Service (the "WCSA Service"), also operated jointly by Hamburg Sud and Hapag Lloyd.  GCT typically receives and handles approximately 1,926 TEUs at the Terminal per week in connection with the WCSA Service (*Id.* ¶ 9).[3]

The Strings account for approximately 60% of the container shipping business at the Terminal (*Id.* ¶ 11).[4]  In 2019, the Strings collectively delivered 153 vessel calls at the Terminal and accounted for approximately $52.6 million in revenues (*Id.*).

### GCT's Agreement with Maersk and Hamburg Sud

The principal focus of this action is a stevedoring and marine terminal services agreement between GCT and Maersk-Hamburg Sud, by which Maersk and Hamburg Sud appointed GCT, throughout the term of the agreement, as their exclusive provider of such services for the Strings in the Port (Atkins Dec. ¶ 12).  Maersk and GCT entered into an Agreement for Terminal Services dated June 22, 2015 (the "Original Agreement, " annexed as Exhibit B to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 13).  Under the terms of the Original Agreement, Maersk engaged GCT to provide stevedoring and marine terminals services (the "Services") for and on behalf of Maersk and its owned and operated vessels (including those operating under the Sealand trade name) carrying containerized cargoes to and from the Terminal (*see Id.*).

The parties subsequently amended the Original Agreement twice (Atkins Dec. ¶ 13).  First, Maersk and GCT amended the Original Agreement through a First Amendment to Agreement for

---

[3] The NAE Service, ECSA Service and WCSA Service are referred to collectively herein as the "Strings".

[4] GCT also provides stevedoring and marine terminal services to a waste energy company in connection with that company's intra-harbor barge operation of containerized municipal waste which is transferred through the Terminal.  Even if these barge operations are included in the calculation, the Strings still account for 46% of the container handling business at the Terminal (*Id.*).

Terminal Services dated June 23, 2017 (the "First Amendment," annexed as Exhibit C to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 14).   Second, the Original Agreement was amended by a Second Amendment to Agreement for Terminal Services dated as of November 19, 2018, which was entered into by Maersk, Hamburg Sud and GCT (the "Second Amendment," annexed as Exhibit D to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 15).[5]

The parties entered into the Second Amendment following Maersk's acquisition of Hamburg Sud in November 2017 (Atkins Dec. ¶ 16).   The Second Amendment added Hamburg Sud as a party to the Original Agreement and First Amendment and terminated then-existing stevedoring and marine terminal service agreements and arrangements between GCT and Hamburg Sud (*see* Second Amendment).   Under the Second Amendment, the term "Maersk" is defined to collectively mean Maersk and Hamburg Sud (*see Id.* §§ 3 and 4).

The Second Amendment changed the structure of the Agreement by extending its term from June 22, 2019, to December 31, 2022, subject only to Maersk's option to terminate the Agreement for convenience on December 31, 2021 (the "Term") (*see* Second Amendment §§ 2 and 11).   In order to exercise this early termination option, the Second Amendment obligates Maersk to provide not less than six months' written notice on or before June 30, 2021 (*see* Second Amendment § 11).   The notice period was negotiated and included to provide GCT sufficient lead time to adequately adjust to and prepare for any loss of business at the end of 2021, bearing in mind that much of the alternative container handling business in the Port is locked into fixed term contracts (Atkins Dec. ¶ 17).

---

[5] The Original Agreement, the First Amendment and the Second Amendment are referred to collectively herein as the "Agreement".

In order to terminate for convenience on December 31, 2021, the Second Amendment obligates Maersk to pay GCT a termination fee (the "Termination Fee"), which is calculated from the volume discounts previously given by GCT to Maersk and Hamburg Sud on an annual basis for the 2019 and 2020 contract years (and to forego volume discounts for the 2021 contract year) (*see* Second Amendment § 11). This Termination Fee is not intended as a proxy for damages that GCT may suffer as a result of any breach by Maersk resulting in premature termination; instead it is to refund the volume discounts, which were provided to Maersk solely in exchange for extending the Term of the Agreement to December 31, 2022 (Atkins Dec. ¶ 18).

The Second Amendment compels Maersk and Hamburg Sud to bring all vessel calls in the Port for the three Strings to the Terminal throughout the Term (the only exception being a *force majeure* event temporarily incapacitating the Terminal) (*see* Second Amendment § 5). In addition, the Second Amendment prohibits Maersk and Hamburg Sud from using any other container terminal in the Port to provide Services to the Strings (*see Id.*). GCT thus enjoys the exclusive right throughout the Term to provide Services to all Maersk and Hamburg Sud vessels operating in the Strings and calling in the Port (Atkins Dec. ¶ 19).

The fixed term and exclusivity aspects of the Second Amendment were bargained for and eventually agreed between the parties as an essential and integral part of the Agreement (Atkins Dec. ¶ 20). If not for these promises and commitments from Maersk and Hamburg Sud, GCT would not have reciprocally agreed to the volume discount program and favorable contract rates set forth in the Second Amendment (*Id.*).

Hapag Lloyd—the third carrier that contributes to two of the Strings at issue—does not currently have a long-term marine terminal services agreement with GCT (Atkins Dec. ¶ 21). However, because of the vessel sharing arrangements between Hapag Lloyd and Hamburg Sud

with respect to the ECSA and WCSA Services, its vessels also call at the Terminal and GCT necessarily provides stevedoring and marine terminal services to Hapag Lloyd as a result (*Id.*).

## Repudiation of Agreement by Maersk and Hamburg Sud

In March 2020, GCT became concerned that Maersk and Hamburg Sud were planning to breach the Agreement by terminating it prematurely and transferring all Services and business associated with the Strings from GCT to APMT[6] (Atkins Dec. ¶ 22).  In order to address these concerns, GCT wrote to Maersk on March 2, 2020, requesting that Maersk confirm its intentions with respect to its ongoing performance obligations (letter annexed as Exhibit E to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 23).  Maersk did not reply (*Id.*).

Further concerned that APMT was attempting to induce Maersk and Hamburg Sud to prematurely exit the Agreement, in order to bolster its own container throughput volumes, GCT wrote to APMT on March 13, 2020 notifying APMT that Maersk was contractually bound to GCT and the Terminal through at least December 31, 2021, and cautioning APMT not to take any action which might induce or cause Maersk to cancel the Agreement prematurely (letter annexed as Exhibit F to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 24).  APMT also did not reply (*Id.*).

In the third week of March, without any advance notification from Maersk, GCT learned that Maersk had rerouted two vessels that should have called at the Terminal in connection with the Strings to a competing terminal in the Port (Atkins Dec. ¶ 25).  Those two vessels, the CAP ANDREAS and the MAERSK KARACHI, had on board a combined 957 import and export containers that should have been handled by GCT under the Agreement (*Id.*).  The loss of these

---

[6] The Maersk 2019 Annual Report (publicly available at https://investor.maersk.com/investor-relations) confirms that each of Maersk, Hamburg Sud and APMT is a wholly-owned subsidiary of A.P. Moller – Maersk A/S.

specific container volumes at the Terminal resulted in the loss of stevedoring and terminal handling revenues totaling no less than $228,359.00 (*Id.*).

On April 10, 2020, the Good Friday public holiday recognized by all container terminal operators in the Port, and in the midst of the ongoing COVID-19 emergency in the New York metropolitan area, GCT received a letter from Maersk purporting to terminate the Agreement without cause *on a mere 20 days' notice*, rather than the required 6 months' notice (the "Repudiation Letter," annexed as Exhibit G to GCT's concurrently-filed Complaint; *see* Atkins Dec. ¶ 26).[7]

In blatant violation of the fixed term provisions contained in the Agreement, Maersk announced in the Repudiation Letter that "all Maersk Line-operated vessels (including those Sealand and Hamburg Sud services currently calling at GCT)" would cease calling at GCT "no later than May 1, 2020" (*see* Repudiation Letter) (Atkins Dec. ¶ 27). The effective date of the purported termination was thus *a full 20 months* before the earliest date by which the Agreement could be terminated by Maersk for convenience, *i.e.*, December 31, 2021 (*Id*. ¶ 26). In blatant violation of the exclusivity provisions contained in the Agreement, Maersk advised GCT that all three Strings and associated vessels and Services would be transferred from GCT to its New Jersey affiliate APMT on or before May 1, 2020 (*see* Repudiation Letter) (*Id.* ¶ 28).

Maersk and Hamburg Sud are not purporting to terminate the Agreement for cause (*see* Repudiation Letter); they are attempting to do so for their own convenience and for the financial benefit of their affiliate APMT, which directly competes with GCT for business in the Port (Atkins

---

[7] Subsequently, GCT learned that Maersk had begun to lay the groundwork for the intended transfer of the Strings to APMT, when GCT was informed by a representative of the Association of Bi-State Motor Carriers that Maersk had directed empty container returns to APMT instead of GCT (Atkins Dec. ¶ 28).

Dec. ¶ 29). The Agreement contains a bargained for procedure governing termination for convenience (*see* Second Amendment § 11), and Maersk and Hamburg Sud are blatantly violating it (*Id*.).

Maersk and Hamburg Sud are not cancelling the Strings or leaving the Port altogether. Rather, they are effecting a wholesale transfer of the business associated with the Strings from GCT to APMT on the New Jersey side of the Port, in total derogation of the exclusivity protections granted to GCT for the next 20 months (Atkins Dec. ¶ 30).

## Irreparable Injury to GCT

The wrongful and premature effort by Maersk and Hamburg Sud to terminate the Agreement, and the precipitous manner in which they seek to do so, will have immediate and catastrophic effects on the business and financial well-being of GCT and its employees, which are exacerbated given the timing of the purported termination (Atkins Dec. ¶ 31).

The purported termination will not only involve the exit of Maersk and Hamburg Sud, but the exit of Hapag Lloyd as well (Atkins Dec. ¶ 35). As detailed above, GCT does not currently have a long-term contract with Hapag Lloyd, but necessarily provides Services to it as a result of vessel sharing arrangements between Hapag Lloyd and Hamburg Sud (*Id.*). The three Strings account for approximately 60% of the containerized volumes at the Terminal (excluding, as noted above, services that GCT provides to a waste energy company), generating on average 3 vessel calls and containerized throughput of approximately 4,133 TEUs per week (*Id.*). In 2019, the Strings collectively delivered 153 vessel calls at the Terminal and accounted for approximately $52.6 million in total revenues (*Id.* ¶ 11). Projected over the course of the next 20 months, this translates to a catastrophic loss of at least 240 vessel calls and 330,640 TEUs (*Id.* ¶ 35).

If Maersk is permitted to exit the Agreement on May 1, 2020, it will have done so a full 20 months before the earliest date that it is contractually entitled to do so (Atkins Dec. ¶ 33). Moreover, it is attempting to do so on a mere 20 days' prior notice in the middle of an unprecedented and crippling global pandemic (*Id.*). As explained above, the Second Amendment calls for a minimum six months' notice in connection with an allowed termination for convenience on December 31, 2021 (*Id.*). This lead time was bargained for to provide GCT with sufficient time to plan for and adjust to an orderly transition of business triggered by such a termination (*Id.*). Maersk's attempt to short sheet this process is unacceptable and should not be condoned.

Almost all of the existing container shipping business at competing container terminals in the Port is currently locked into long-term terminal service agreements (similar to GCT's agreement with Defendants, upon which it relied) (Atkins Dec. ¶ 37). And the current public health crisis precludes GCT from pursuing on short notice what little available business may exist (which would, in no event, be sufficient to replace the loss of the three Strings) (*Id.*).

In the event of a loss of the three Strings without the bargained for timeframe to replace the business, the immediate drop in revenue will seriously endanger GCT's continued viability (Atkins Dec. ¶ 40). According to 2020 budget projections, GCT expected to generate annual revenues of approximately $124.7 million with annual earnings before interest, tax, depreciation and amortization ("EBITDA") of approximately $30.3 million for 2020 (*Id.*). If Maersk and Hamburg Sud are permitted to walk from the Terminal in blatant disregard of their obligations and contractual commitments, revenues are projected to plummet by more than half to $61.9 million or less, with resulting EBITDA of *negative* $7.1 million (*Id.*). Without positive EBITDA, the Terminal will cease to be a going concern. Permitting Defendants to walk away from their

contractual obligations in the current environment would thus significantly jeopardize the Terminal's continued viability (*Id.*).

And this projected negative EBITDA is exacerbated by the fact that the GCT Lease with PANYNJ requires GCT to load and discharge at least 140,000 qualified containers at the Terminal during each lease year (*see* Lease § 56) (Atkins Dec. ¶ 36). If GCT fails to load and discharge its guaranteed minimum number of qualified containers in any lease year, it is required to pay a "guaranteed rental" to PANYNJ calculated in accordance with the terms of the Lease (*see* Lease § 56) (*Id.*). Accordingly, on top of the projected negative EBITDA resulting from Maersk's premature and wrongful exit from the Terminal, GCT would inevitably fall below its minimum annual guarantee for the current lease year, thereby increasing its rental obligation to PANYNJ in an amount yet to be determined (*Id.*). Such a result would compound the jeopardy to GCT's continued viability.

A threat to GCT's continued viability is a threat to the local economy of Staten Island. GCT is one of the top private employers on Staten Island, providing secure and good paying jobs to many longshoremen, many of whom have depended upon the Terminal for their livelihoods for many years (Atkins Dec. ¶ 38). If Maersk and Hamburg Sud are permitted to exit the Terminal on a whim and in gross violation of their obligations and commitments under the Agreement, their action will cause an immediate loss of jobs (*Id.*). As measured in man hours and full-time equivalents, GCT projected a total of 721,599 man hours to be worked at the Terminal in 2020, which translates to approximately 345 full time equivalent positions (*Id.*). With the loss of business threatened by Maersk and Hamburg Sud, the number of man hours at the Terminal is projected to fall to 460,844 with full time equivalent positions declining to just 221 (*Id.*). Even if the Terminal remains viable for a period, those longshoremen whose positions are not terminated

will experience a drastic drop in earnings due to less work hours attributable to substantially less throughput moving through the Terminal (*Id.*). But, ultimately, Maersk's purported termination puts *all* of the jobs at the Terminal at eventual risk as it jeopardizes the viability of GCT's business.

GCT's maintenance labor at the Terminal is provided by International Longshoremen's Association ("ILA") Local 1814 and employed through GCT's wholly-owned subsidiary, Island Securing & Maintenance, Inc. ("Island") (Atkins Dec. ¶ 39). The management association representing employers of Local 1814 labor, such as Island, is Metropolitan Marine Maintenance Contractors Association, Inc. ("MMMCA") (*Id.*). MMMCA and the ILA have established various pension and welfare funds to administer benefits on behalf of active and retired workers covered under collective bargaining agreements between MMMCA and the union locals (*Id.*). A precipitous decline in the maintenance labor force at the Terminal caused by the threatened exit of Maersk and Hamburg Sud is likely to trigger unfunded liability obligations on the part of Island under the Metro-ILA Pension Fund, an issue currently being examined by the Fund's actuaries (*Id.*). Furthermore, GCT is the sole employer of unionized labor from ILA Local 920 (*Id.* ¶ 38). If Maersk and Hamburg Sud are allowed to wrongfully exit the Terminal, causing sharp reductions in positions and hours, the impacts will be felt immediately by members of this Local (*Id.*).

In addition, the revenue loss associated with Defendants' threatened breach will reverberate through the Staten Island economy and have adverse tax revenue effects for the City and State of New York (*Id.*). The sharp declines in business threatened by the precipitous actions of the Defendants will also have a knock-on effect on GCT's vendors, suppliers and third party service providers who depend on GCT for business (*Id.*). Defendants cannot be permitted to harm GCT, its employees and their community in blatant violation of Defendants' contractual obligations.

## ARGUMENT

A plaintiff seeking injunctive relief, whether in the form of a temporary restraining order or preliminary injunction, must demonstrate: (a) a likelihood of success on the merits; (b) that absent an injunction Plaintiff will suffer irreparable injury that cannot be remedied with monetary damages; (c) that the balance of hardships tips in favor of Plaintiff; and (d) that the public interest "would not be disserved" by a permanent injunction. *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010); *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 327 (S.D.N.Y. 2011).

### POINT ONE

### GCT WILL SUFFER IRREPARABLE HARM
### IN THE ABSENCE OF IMMEDIATE INJUNCTIVE RELIEF

Irreparable injury may be shown where a business "would suffer a substantial loss of business and perhaps even bankruptcy" absent injunctive relief. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 932 (1975). Indeed, numerous cases within the Second Circuit have recognized that monetary relief is inadequate "where the loss threatens the very existence of the movant's business" and that such a loss constitutes an irreparable injury requiring injunctive relief. *Safeco Ins. Co. of Am. v. M.E.S., Inc.*, No. 09-CV-3312, 2010 LEXIS 133957, at *25 (E.D.N.Y. Dec. 17, 2010) (quoting *Malarkey v. Texaco, Inc.*, 794 F. Supp. 1248, 1250 (S.D.N.Y. 1992)). *See John B. Hull v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24, 28-29 (2d Cir. 1978); *Semmes Motor, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970); *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir. 1995) ("Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury"), *cert. denied*, 517 U.S. 1119 (1996); *Progressive Restaurant Systems, Inc. v. Wendy's Int'l, Inc.,* 90-CV-791, 1990 U.S. Dist. LEXIS 9289 at *4, (N.D.N.Y. July 20, 1990) ("[t]he threat of bankruptcy or loss of a party's business, absent the

granting of preliminary relief, constitutes irreparable injury, for otherwise a final judgment might be useless").

Here, the irreparable injury to GCT resulting from Maersk's wrongful and premature effort to terminate the Agreement is manifest through the immediate and catastrophic effects it will have on GCT's business and financial well-being. Indeed, because of the vessel sharing arrangements between Hapag Lloyd and Hamburg Sud, GCT can be assured of retaining the Hapag Lloyd business only for the duration of its contract with Maersk. As such, if Maersk is allowed to wrongfully terminate the Agreement, GCT will not only lose the business of Hamburg Sud, but likely also the business of Hapag Lloyd.

This business accounts for a full 60% of GCT's container handling business. Thus, the financial impact of losing this business would be catastrophic and immediate. According to 2020 budget projections, GCT expected to generate revenues of approximately $124.7 million with EBITDA of approximately $30.3 million. If Maersk and Hamburg Sud are permitted to walk from the Terminal, revenues will plummet to $61.9 million or less, with resulting EBITDA of *negative* $7.1 million. The net result of this is that GCT will cease to be a going concern, significantly jeopardizing the Terminal's continued viability.

Moreover, GCT has no way of replacing this business to stave off financial ruin. The lead time for termination contained in the parties' agreement was specifically bargained for to provide GCT with sufficient time to plan for and adjust to an orderly transition of business triggered by such a termination.[8] GCT has no way of replacing this business on the minimal notice that Maersk

---

[8] In the Repudiation Letter, Maersk deliberately misconstrues its own obligations under the Agreement and offers GCT pennies on the dollar to accept its repudiation. In offering this amount, Maersk states in sum and substance that GCT should be happy with the amount so offered in view of its alleged "waiver of any rights to any loss profits, loss of revenue and any consequential or indirect losses in connection with any departure of Maersk Line from GCT." This is an outrageous

has provided. This is particularly true given that the United States and the New York metropolitan area are in the midst of the raging COVID-19 emergency, with social distancing and stay-at-home directives in place and attendant concerns about the spread of infections making it impossible for GCT to mitigate against this loss. Indeed, as evidenced by the fact that Maersk has already diverted two ships from the Terminal and directed that empty containers be returned to APMT rather than GCT, it is unclear that Defendants intend even to abide by the minimal and improper notice that they provided. Accordingly, the only way to ensure GCT's survival is the immediate issuance of a temporary restraining order. GCT has thus established the element of irreparable injury.

## POINT TWO

### GCT IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM
### FOR BREACH OF CONTRACT

Parties can satisfy the second element necessary to obtain injunctive relief by either showing that they are likely to succeed on the merits of their underlying claim or by demonstrating that they have raised serious questions going to the merits to make them fair grounds for litigation and that the balance of hardships tips in their favor. *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008); *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004). As detailed below, GCT more than satisfies the likelihood of success portion of the test.

The Agreement is governed by the general maritime law of the United States and, to the extent not inconsistent therewith, the laws of the State of New York. In closely analogous cases, courts have applied federal maritime law to the breach claims, supplemented by New York law

---

position and one that is wholly inconsistent with the letter, spirit and existence of the fixed-term Agreement. Suffice it to say that GCT completely disagrees with this position. However, if this is its argument, then Maersk cannot have it both ways. Maersk cannot claim that GCT has waived its right to any meaningful compensatory remedy under the Agreement and, in the same breath, contend that available compensatory damages would be sufficient to make GCT whole for the injury caused by Maersk's wholesale repudiation and material breach of the Agreement.

where it is more specific. *In re M/V MSC Flaminia*, 339 F. Supp. 3d 185, 241-242 (S.D.N.Y. 2018).. Basic principles in the common law of contracts readily apply in the maritime context. *Id.*

Under admiralty law, "the elements of a breach of contract claim mirror that of a common law claim…." *S. Coal Corp. v. IEG PTY, LTD,* No. 14-CV-617, 2015 LEXIS 42942, at *28 (E.D. Va. Mar. 31, 2015). In New York, as elsewhere, the constituent elements of a breach of contract claim are "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *American S.S. Owners Mut. Protection & Indemnity Ass'n, Inc. v. Triumph Maritime, Ltd.*, No. 18-CV-2019, LEXIS 205582, at *5 (S.D.N.Y. Nov. 26, 2019) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).

Neither the existence of the Agreement nor GCT's performance under it are at issue and Defendants have never suggested otherwise, even in their Repudiation Letter. Nor—as detailed at Point 1, *supra*—can there be any legitimate question that GCT will suffer massive resultant harm. In order to establish the final element of the claim, that of material breach, a plaintiff must show that the breach at issue "go[es] to the root of the agreement between the parties.'" *Frank Felix Assocs. Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284,289 (2d Cir. 1997) (citing *Septembertide Pub., B. v. Stein and Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989)). This occurs where a breach is "so substantial that it defeats the object of the parties in making the contract." *Id*.

The purpose of the Agreement is clear: the provision of stevedoring and marine terminal services at the Terminal for three clearly delineated service strings during a fixed term. The Agreement obligates Maersk to direct all of its vessel calls for the Strings in the Port to the Terminal during the term of the Agreement and, and in the absence of a supervening *force majeure* event affecting the Terminal, prohibits Maersk from using rival container terminals to provide

Services to the Strings during the Term. Since this is the essence of the contractual bargain between the parties, any unjustified discontinuance of vessel calls in connection with the Strings would constitute a material breach of the Agreement because it would substantially defeat the parties' essential bargain and GCT's legitimate contractual expectations based thereon. Accordingly, having established all four elements, GCT is assured of success on the merits of its breach of contract claim.

## POINT THREE

### THE BALANCE OF THE HARDSHIPS TIPS DECIDEDLY IN GCT'S FAVOR

The balance of hardships inquiry "asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999). "Where the movant can show that the balance of hardships tips strongly in his favor, the required showing of the probability of its success is reduced. It is enough that the plaintiff's chances are better than negligible." *Ecolab Inc. v. Paolo*, 753 F. Supp. 1100, 1110 (E.D.N.Y. 1991).

Here, GCT will suffer both immediate and long-term irreparable injury in the absence of such injunctive relief, including without limitation near certain collapse of the business on account of the departure of nearly 60% of its container business and the plummeting revenues and negative EBITDA that would result therefrom. In sharp contrast, Maersk will experience no legally cognizable hardship at all if merely compelled to adhere to the terms of the Agreement. In fact, if not enjoined, Defendants will receive a large and unjust benefit by redirecting the contracted volume to their affiliate's container terminal. Accordingly, the balance of hardships between GCT and the Maersk tips in favor of GCT and warrants an award of injunctive relief to GCT.

## THE PUBLIC INTEREST "WOULD NOT BE DISSERVED"
## BY ISSUANCE OF THE INJUNCTION

The Court's issuance of the requested injunction to GCT is entirely consistent with—and supportive of—the public interest. As set forth above, without the Court's immediate intervention, GCT—a provider of essential infrastructure to the New York area—is likely to fail. Among many other things, this will have the immediate effect of separating a substantial number of GCT's workforce, including many of the approximately 271 full and part-time unionized positions at the Terminal from their employment in the midst of a public health crisis that would render it nearly impossible for them to seek alternative employment. As measured in man hours and full-time equivalents, the loss of business threatened by Maersk and Hamburg Sud is projected to reduce the total man hours to be worked at the Terminal in 2020 from 721,599 (translating to approximately 345 full time equivalent positions) to 460,844 (or 221 full time equivalent positions). Many longshoremen whose positions are not terminated will experience an inevitable drop in earnings due to less work attributable to substantially less throughput moving through the Terminal. Moreover, GCT's collapse would also devastate the local economy and deprive the City and State of New York of much-needed tax revenue. Finally, the longshoremen's locals to which many of GCT's employees belong will be substantially impacted.

Furthermore, public policy would be substantially disserved by rewarding Defendants for their anticompetitive behavior. Defendants seek to steer work to their affiliate—one of GTC's direct competitors—in clear violation of the terms of the Agreement. Permitting them to so enrich this much larger terminal will endanger GCT's continued existence, potentially depriving the Port and surrounding area of one of only six container terminals. Accordingly, the injunction is in the public interest and should be granted.

## CONCLUSION

For the foregoing reasons, this Court should:

(a)     pending the hearing and resolution of GCT's application for a preliminary injunction, temporarily restrain and enjoin Maersk and Hamburg Sud from taking any action, whether individually or in concert with others, to implement the purported termination of the Agreement and threatened transfer of the Service Strings pursuant to Maersk's Repudiation or otherwise; and

(b)     following such hearing, enter an Order preliminarily enjoining Maersk and Hamburg Sud, during the pendency of this action from:

(i)     terminating the Agreement for convenience prior to December 31, 2021, on less than six months' prior written notice; and

(ii)     directing, ordering, allowing or causing any marine terminal in the Port other than the Terminal to receive, deliver, handle, load or unload containerized cargoes transported to the Port by Maersk or Hamburg Sud in connection with the Service Strings; and

(iii)     directing, ordering ,allowing or causing any vessel owned, chartered or operated by Maersk  or Hamburg Sud, whether directly or indirectly, and operating in any Service String, to call at any marine terminal in the Port other than the Terminal, except as otherwise permitted under the terms of the Agreement.

Dated: New York, New York.
April 20, 2020

Respectfully submitted,

**VEDDER PRICE P.C.**

By: s/ Daniel C. Green
David M. Rownd
Daniel C. Green
Joshua A. Dunn
1633 Broadway, 31st Floor
New York, New York  10019
Telephone:  (212) 407-7700
E-Mail:  drownd@vedderprice.com
dgreen@vedderprice.com
jdunn@vedderprice.com

*Attorneys for Plaintiff GCT New York LP*